# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 55986-2-II |
| Respondent, | |
| v. | |
| CLAYTON TYRONE KING III, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, C.J.—After police investigated a sex trafficking operation involving the sale of sexual encounters with multiple adult women and children, the State charged several members of the same gang with various crimes. The State charged Clayton Tyrone King III with one count of conspiracy to commit first degree human trafficking and one count of second degree human trafficking. Over the course of about three-and-a-half years, the trial court continued King's trial 12 times. The continuances were largely based on the complexity of the case involving multiple victims and defendants, the large volume of discovery involved, and the impact of the COVID-19 pandemic on the courts. King's attorneys requested or agreed to most of the continuances.

During trial, King repeatedly asked the court to appoint new counsel, but the court declined. A jury found King guilty of both charges with street gang enhancements. Before closing, King's attorney moved to withdraw because King filed a bar complaint against him. The trial court denied the attorney's motion. At sentencing, the court imposed maximum sentences for both convictions,

as well as an additional 60 months for the gang aggravator on the second degree human trafficking conviction.

King appeals. He argues that his speedy trial rights under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution were violated. He also argues that the trial court failed to adequately inquire about his counsel's alleged conflict of interest, and that he was deprived of conflict-free counsel when the court denied his attorney's motion to withdraw in violation of the Sixth Amendment. We affirm King's convictions and his sentence.

FACTS

In 2016, the Lakewood Police Department began investigating a sex trafficking operation involving several women and children. The investigation led the State to charge multiple members of the same gang, including King, with various crimes. On October 2, 2017, the State charged King with one count of conspiracy to commit first degree human trafficking and one count of second degree human trafficking. The State originally charged six others as codefendants. It eventually charged a total of 12 other people as codefendants.

King's case was complex. In the beginning, it involved 15 different victims—five of whom were minors—numerous recorded phone calls, and thousands of pages of discovery. As the case progressed, the number of defendants and the amount of discovery grew. The case eventually involved 13 defendants and more than 100,000 pages of documents, hundreds of hours of recorded calls, "many hours of" taped interviews, and "extensive phone extraction data." Clerk's Papers (CP) at 227. Adding to the complexity, the first attorney representing King was appointed to a

superior court commissioner position shortly before King's trial was set to begin, so a second attorney began representing King.

I. TRIAL CONTINUANCES

A.      Pre-COVID-19 Continuances

King was arraigned in October 2017, and his jury trial was initially scheduled for November 15, 2017.

On October 31, 2017, the State and some of King's codefendants moved to continue the trial to September 2018. King's first attorney objected to the continuance. He explained that he had recently been appointed to represent King and had received no discovery, so he could not determine whether the proposed trial date was appropriate, especially because King was in custody. The trial court granted the request for a continuance despite King's attorney's objection.

In August and November 2018, King's first attorney moved to continue the trial over King's objections because the attorney needed more time to prepare a defense. The trial court granted both continuances.

In January 2019, the State moved to continue the trial, explaining that it expected several of King's codefendants to plead guilty and that it anticipated additional discovery. King's first attorney agreed to the continuance over King's objection, echoing the codefendants' attorneys' concerns about the amount of discovery that needed review. The trial court granted the motion.

In August 2019, King's first attorney agreed to another continuance in order to align King's trial date with his codefendants'. King objected. The court agreed to the continuance, setting a new trial date for December 3, 2019.

In October 2019, King's first attorney moved to withdraw from King's case. He explained that he had been appointed to a superior court commissioner position with a December 9, 2019 start date. Because his new position required him to wind down his law practice, if the trial court were to require him to continue representing King, he would not have income until the case concluded, which counsel anticipated would take several months. Under these circumstances, representing King would be "a huge financial burden." Verbatim Rep. of Proc. (VRP) (Oct. 31, 2019) at 31.

At the conclusion of a second hearing on the motion, the court granted the motion to withdraw, reasoning that requiring the attorney to continue representing King would put "an unreasonable financial burden on" him under RPC 1.16(b)(6).[1] VRP (Nov. 1, 2019) at 12. The court then appointed King's second attorney, who moved to continue the trial so he could prepare. The trial court granted the continuance, noting the "extensive discovery" the case involved and setting the trial for May 4, 2020. CP at 30. King refused to sign the order continuing the trial date.

B.     Post-COVID-19 Continuances

In March 2020, the Pierce County Superior Court suspended criminal jury trials "until at least April 24, 2020." CP at 277. In early April 2020, King's second attorney moved to continue the trial over King's objection. He stated that in his "professional opinion, after 43 years of experience in major felony crimes," he was "not adequately prepared to provide effective assistance of counsel." VRP (April 9, 2020) at 19. The trial court granted the motion, adding that

---

[1] RPC 1.16(b)(6) states that "a lawyer may withdraw from representing a client if . . . the representation will result in an unreasonable financial burden on the lawyer."

the COVID-19 pandemic had made the May 4, 2020, trial date unfeasible. The trial court continued King's trial to September 14, 2020.

In April and May 2020, Pierce County Superior Court suspended criminal jury trials again due to COVID-19, with the May suspension lasting until July 6, 2020. In August 2020, King's second attorney emailed the trial court about an "agreed continuance," explaining that he was in trial at a different court and that court had ordered him to declare himself unavailable for other trials. CP at 517. The trial court continued King's trial to October 27, 2020.

In October 2020, the trial court continued King's case again upon the agreement of King's second attorney and the State. The trial court noted that the parties were negotiating and needed additional time to get the case ready for trial. The case was continued two more times because Pierce County Superior Court suspended criminal trials from November 23, 2020, until March 1, 2021, due to the COVID-19 public health emergency.

On February 25, 2021, King's second attorney made the twelfth and last motion to continue the trial. The attorney explained that he needed time to get a second COVID-19 vaccine. The trial court granted a continuance of six days. When the trial court asked King if he had an objection to the trial date, he replied, "I've been ready to go, Your Honor, since 2017." VRP (Feb. 25, 2021) at 20.

At the same hearing, King asked the trial court to remove his second attorney and appoint a new one. He said that his conversations with the second attorney were "always arguments." *Id.* at 5. He added that he was "still fighting for [his] full discovery." *Id.* He explained that while he understood that getting a new attorney would push his trial date back again, he felt that a substitution would ultimately benefit him because the second attorney did not have his "best

interests at heart." *Id.* at 5-6. The second attorney replied that his responsibility was "to inform and advise," but King "becomes upset with [his] analysis and . . . discontinues the conversation." *Id.* at 6. He added that COVID-19 hampered his ability "to engage in regular and consistent meetings with" King. *Id.* at 6-7. The trial court asked, "Do you feel that communications have broken down to the extent that you're not able to effectively represent [King]?" *Id.* at 8. The attorney said, "Well, yes, because he basically won't talk to me." *Id.* But the trial court denied King's request to substitute counsel, finding that there was no legal basis for doing so.

## II. TRIAL

King's trial began on March 15, 2021, the first day jury trials resumed in Pierce County Superior Court. In his trial brief, King moved for dismissal, alleging violations of his speedy trial rights under CrR 3.3, the Sixth Amendment to the United States Constitution, and article I, section 22 of the Washington Constitution.[2] King also moved for dismissal on the basis of being denied effective assistance of counsel, arguing that his attorney had not "been able to spend sufficient time with [him] to fully advise him of the evidence and discovery." CP at 110. The trial court denied "a motion to dismiss for any claim of ineffective assistance of counsel," stating that it had no indication that the second attorney was inadequately prepared to represent King. VRP (March 15, 2021) at 23. The trial court also denied "a motion to dismiss based upon any Criminal Rule 3.3, time-for-trial violations." *Id.* It did not specifically address King's federal and state constitutional speedy trial claims.

---

[2] Our record indicates that King himself requested that his attorney raise these issues in the trial brief.

6

On the second day of trial, King again asked for substitution of counsel, stating that communication was still difficult and that the attorney was not filing the motions he wanted filed. The trial court denied King's request, telling King that his attorney had a duty to refrain from filing meritless motions. As the trial went on, King continued to ask for a new attorney, eventually informing the trial court that he had filed a bar complaint with the Washington State Bar Association against his second attorney.

Before closing arguments, the second attorney informed the trial court that the bar association had requested a response to King's bar complaint. Stating that the request created an exception to the rule of professional conduct requiring "confidentiality of communication between client and attorney," the second attorney requested withdrawal from King's case. VRP (April 26, 2021) at 1941. He asked the trial court to make a ruling and advise King about the exception to the confidentiality rule, which would allow the attorney to communicate with the bar association in his own defense but would not otherwise affect his duty of confidentiality. The trial court declined to grant the motion to withdraw, noting that the attorney had yet to respond to King's bar complaint and that closing arguments were about to begin.

After the trial concluded, the jury found King guilty of conspiracy to commit first degree human trafficking and second degree human trafficking, both with street gang sentencing enhancements.

### III. SENTENCING

Prior to sentencing, the second attorney filed a written motion to withdraw, arguing that because the bar association had asked for a detailed response to King's grievance, he did not believe he could continue to ethically represent King. At a hearing on the motion, the second

attorney contended that he could no longer honor his professional obligations to maintain confidentiality, zealously advocate for his client, and maintain candor with the court. He added that he would be able to "more fully explain that in an in-camera proceeding." VRP (July 2, 2021) at 5.

The trial court denied the second attorney's motion to withdraw without conducting an in-camera hearing. It concluded that while the Rules of Professional Conduct recognize the difficulty an attorney faces when a client they are actively representing files a bar complaint against them, appointing a new attorney "would create an even greater question of whether there was effective assistance of counsel" at sentencing. CP at 231. It added that because it had "discretion in deciding whether to impose an exceptional sentence," participating "in the proposed ex-parte in-camera" proceeding would create "an appearance of fairness issue." CP at 230.

The trial court found that the second attorney's obligation to the court at sentencing and his obligation to King were "not at odds" because the attorney was "able to make argument based on the evidence presented at trial, the statutory factors regarding the defendant and his prior history, and other relevant information." CP at 231. And the trial court concluded the record reflected that King had "chosen to attack his attorneys rather than work with them." CP at 230.

At sentencing, the second attorney recommended a sentence at the low end of the standard range. For the conspiracy to commit first degree human trafficking conviction, the trial court imposed the maximum sentence of 120 months. For the second degree human trafficking conviction, the standard range was 240 to 318 months, and the trial court imposed the maximum sentence of 318 months plus "an additional 60 months for the gang aggravator." VRP (July 16, 2021) at 2068; *see also* CP at 236. The trial court said the exceptional sentence was "appropriate .

. . to reflect the jury's finding that" King's actions directly contributed to the gang's activities, benefited the gang, and benefited King's stature in the gang. VRP (July 16, 2021) at 2068.

King appeals.

## ANALYSIS

### I. CONSTITUTIONAL SPEEDY TRIAL RIGHTS

King argues that a "trial delay of" about three-and-a-half years, "due in large part to the trial court's decision to allow [his] original defense counsel to withdraw on the eve of the scheduled trial in 2019, violated [his] right to a speedy trial." Opening Br. of Appellant at 8. The State responds that we should decline to review this claim, contending that King did not properly preserve it below because his attorneys did not object to most of the continuances. We conclude that King preserved his claim and hold that his constitutional speedy trial rights were not violated.

A.      Issue Preservation

We "may refuse to review any claim of error [that] was not raised in the trial court." RAP 2.5(a). But here, King repeatedly objected to motions for continuances. He also argued in his trial brief that his federal and state constitutional speedy trial rights were violated. King therefore raised the constitutional issue he asks us to address on review, and the trial court had the opportunity to consider King's constitutional speedy trial rights and correct any alleged error. *See State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009).

B.      Constitutional Speedy Trial Rights

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a criminal defendant the right to a speedy trial. *State v. Ross*, 8 Wn. App. 2d 928, 932, 441 P.3d 1254 (2019). The "analysis for speedy trial rights under article

I, section 22 is substantially the same as the Sixth Amendment analysis." *State v. Ollivier*, 178 Wn.2d 813, 826, 312 P.3d 1 (2013). We review de novo whether a defendant's constitutional speedy trial rights were violated. *Ross*, 8 Wn. App. 2d at 941.

To show a violation of constitutional speedy trial rights, the defendant must first "make a threshold showing that the time between the filing of charges and trial exceeded the ordinary interval for prosecution and crossed into presumptively prejudicial delay." *Id.* at 942. Washington courts have generally held that a delay approaching one year is presumptively prejudicial. *Id.* at 942-43; *Ollivier*, 178 Wn.2d at 828. In *Ollivier*, the Washington Supreme Court found a 23-month delay presumptively prejudicial despite complex pretrial discovery and suppression issues. 178 Wn.2d at 828, 835-36.

If the defendant makes a threshold showing of presumptively prejudicial delay, we use the balancing test from *Barker v. Wingo*[3] to determine if the delay violated the defendant's constitutional speedy trial rights. *Id.* at 827. "Among the nonexclusive factors to be considered are the '[l]ength of delay, the reason for the delay, the defendant's assertion of [their] right, and prejudice to the defendant.'" *Id.* (first alteration in original) (quoting *Barker*, 407 U.S. at 530). The analysis is fact-specific and dependent "on the particular circumstances of the case." *Ross*, 8 Wn. App. 2d at 942. Thus, while the four *Barker* factors guide the analysis, no one factor "is sufficient or necessary" for finding a violation. *Id.*

Here, King has made a threshold showing of presumptively prejudicial delay. The delay in King's case was almost twice as long as the delay in *Ollivier*, where there was complex pretrial discovery. Here, the State filed charges on October 2, 2017, and the trial started on March 15,

---

[3] 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972).

2021, so King experienced a delay of more than 41 months, or about three years and five months. This presumptively prejudicial delay triggers the four-factor *Barker* analysis.

1.       Length of delay

The first *Barker* factor, length of delay, "focuses on the extent to which the delay stretches past the bare minimum needed to trigger the *Barker* analysis." *State v. Iniguez*, 167 Wn.2d 273, 283-84, 217 P.3d 768 (2009). Reviewing federal cases, the court in *Ollivier* noted that federal courts of appeal found that delays lasting between 21 and 58 months were not exceptionally long, "particularly when the delay was attributable to the defense." 178 Wn.2d at 828.

Under our case law, the 41-month delay King experienced was not exceptionally long, especially because—as we explain below—most of the delays took place after King's attorneys requested or agreed to continuances. Thus, the length of the delay weighs against finding violations of King's constitutional speedy trial rights.

2.       Reason for delay

The second *Barker* factor, the reason for the delay, is the main focus of our inquiry. *Id.*at 831. When determining whether the reason for the delay weighs in favor of finding a violation of constitutional speedy trial rights, we look "to each party's responsibility for the delay," assessing "the impact of the delay on [the] defendant's right to a fair trial." *Id.* For example, if the State "deliberately delays the trial to frustrate the defense," the second *Barker* factor weighs heavily in favor of finding a violation. *Id.* at 832. If the delay is due to the State's negligence or overcrowded courts, this factor weighs in favor of finding a violation, but to a lesser extent. *Id.*

At the other "end of the spectrum is the situation where the defendant requests or agrees to the delay and therefore 'is deemed to have waived [their constitutional] speedy trial rights as long

as the waiver is knowing and voluntary.'" *Id.* at 831 (quoting *Iniguez*, 167 Wn.2d at 284). Where the defendant objects to their attorney's requests for continuances, the delay is still attributed to the defendant if the attorney sought the continuances to provide better representation. *See id.* at 834-35.

Here, the reasons for the delay weigh against finding that King's constitutional rights were violated. Of the twelve continuances, nine were proposed or agreed to by King's defense attorneys to allow time for trial preparation or to address concerns around in-person gatherings during COVID-19. Although King repeatedly objected to the continuances his attorneys sought or agreed to for trial preparation purposes, the Supreme Court's analysis in *Ollivier* supports the conclusion that, under these circumstances, King waived his constitutional speedy trial rights. *See id.* at 834-35. And neither party was responsible for the delays associated with COVID-19, so these delays do not weigh in favor of finding a violation.

Additionally, none of the delays that were requested for other reasons weigh in favor of finding a violation. Both King and his first attorney objected to the first continuance, but the record does not indicate that the State requested it because it wanted to frustrate King's defense or because it acted negligently. Rather, the State requested the continuance because the case involved extensive discovery and numerous victims. King's first attorney agreed to one continuance because he wanted to align King's trial date with his codefendants' trial dates. And King's second attorney requested a continuance because a different trial court ordered him to declare himself unavailable for any trial.

Given that most of the continuances took place because King's attorneys needed to prepare for trial or because of the COVID-19 pandemic, and the remaining continuances were reasonable

12

and necessary, the second *Barker* factor weighs against finding a violation of King's constitutional speedy trial rights.

### 3. Assertion of rights

The third *Barker* factor requires us to examine "'the defendant's assertion of or failure to assert'" their constitutional speedy trial rights. *Ollivier*, 178 Wn.2d at 837 (quoting *Barker*, 407 U.S. at 528). Where a defendant asserts the rights but their attorney seeks continuances to prepare for trial, this factor is neutral. *See id.* at 839-40.

Here, King repeatedly objected to his attorneys' requests for continuances. In King's trial brief, his second attorney noted King's claim that his right to a speedy trial was violated under the United States Constitution and the Washington Constitution. But because the majority of the continuances occurred to allow King's attorneys to prepare for trial, the third *Barker* factor weighs neither for nor against finding that King's constitutional speedy trial rights were violated.

### 4. Prejudice

The fourth *Barker* factor requires us to determine "whether the delay has prejudiced the defendant." *Ross*, 8 Wn. App. 2d at 955. Generally, "a defendant must show actual prejudice to establish" a violation of their constitutional speedy trial rights, but we presume prejudice when the State's negligence causes the delay and the delay itself is extraordinary. *Id.* at 956.

A showing of actual prejudice "may consist of (1) oppressive pretrial incarceration, (2) the defendant's anxiety and concern, and (3) the possibility that dimming memories and loss of exculpatory evidence will impair the defense." *Id.* at 955. The last interest is the most serious, because a defendant's inability to adequately prepare their case "'skews the fairness of the entire system.'" *Id.* (quoting *Barker*, 407 U.S. at 532).

We cannot presume prejudice here because the record does not indicate that the State's negligence caused the delay. Additionally, King does not argue on appeal that he faced oppressive pretrial incarceration, that he experienced undue anxiety and concern, or that the delay impaired his defense. *See* Opening Br. of Appellant at 18-19. The fourth *Barker* factor thus weighs against finding a violation of King's constitutional speedy trial rights.

The first, second, and fourth *Barker* factors weigh against King's claim. The third factor points in neither direction. Accordingly, we hold that the State did not violate King's constitutional speedy trial rights under the United States and Washington Constitutions.

## II. MOTION TO WITHDRAW

King argues that the "trial court failed to adequately inquire into counsel's request to withdraw based on an irreconcilable conflict." Opening Br. of Appellant at 19. We conclude that reversal of King's convictions and sentence is not required.

"A trial court has a duty to determine whether an actual conflict exists before it may grant a motion to withdraw and substitute counsel." *State v. Vicuna*, 119 Wn. App. 26, 30, 79 P.3d 1 (2003). The determination of whether a conflict requiring withdrawal exists is a question of law that we review de novo. *Id.* "If a conflict creates a legal duty to withdraw, denying withdrawal is an abuse of discretion." *State v. O'Neil*, 198 Wn. App. 537, 543, 393 P.3d 1238 (2017).

The Sixth Amendment to the United States Constitution guarantees the right to effective assistance of counsel. *In re Pers. Restraint of Gomez*, 180 Wn.2d 337, 350, 325 P.3d 142 (2014). The guarantee consists of two related rights: the right to reasonably competent counsel and the right to counsel's undivided loyalty. *McMann v. Richardson*, 397 U.S. 759, 771, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970); *Wood v. Georgia*, 450 U.S. 261, 271-72, 101 S. Ct. 1097, 67 L. Ed. 2d

14

220 (1981). Accordingly, "the right to effective assistance of counsel includes the right to conflict-free counsel." *Gomez*, 180 Wn.2d at 348. "But a conflict of interest is not a per se violation of the right" to effective assistance of counsel. *Id.* To establish a violation, a defendant must show that "defense counsel 'actively represented conflicting interests'" and that "the 'actual conflict of interest adversely affected'" defense counsel's performance. *Id.* at 348-49 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980)). The defendant bears the burden of proof as to both an actual conflict and an adverse effect on counsel's performance. *State v. Dhaliwal*, 150 Wn.2d 559, 573, 79 P.3d 432 (2003).

An actual conflict is one that affects counsel's performance rather than "'a mere theoretical division of loyalties.'" *Id.* at 570 (quoting *Mickens v. Taylor*, 535 U.S. 162, 171, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002)). Consistent with the right to counsel's undivided loyalty, under the RPC, "a lawyer shall not represent a client if . . . there is a significant risk that the representation . . . will be materially limited . . . by a personal interest of the lawyer." RPC 1.7(a)(2). While the RPC "do not 'embody the constitutional standard for effective assistance of counsel,'" they serve as "guides for determining what is reasonable." *Gomez*, 180 Wn.2d at 349 (quoting *State v. White*, 80 Wn. App. 406, 412-13, 907 P.2d 310 (1995)).

For purposes of RPC 1.7, a lawyer's personal interest includes "an interest arising out of the lawyer's exposure to culpability." *In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 740, 16 P.3d 1 (2001). However, in *State v. Sinclair*, the court held that bar complaints create potential rather than actual conflicts of interest, reasoning that if a bar complaint were "sufficient to disqualify court-appointed counsel . . . a defendant could force the appointment of a new attorney

simply by filing such a complaint, regardless of its merit." 46 Wn. App. 433, 437, 730 P.2d 742 (1986).

Here, King fails to articulate an actual conflict of interest. Even though his second counsel had to defend against the bar complaint that King brought against him, the trial court emphasized counsel's obligation to continue to represent King to the best of his ability, stating that while the RPC recognize the difficulty a bar complaint presents, they concurrently recognize "ongoing obligations to the tribunal to continue in representation of a client who has been through a trial and" is about to undergo sentencing. VRP (July 2, 2021) at 13. The trial court also emphasized the depth of counsel's experience. And while King's second counsel repeatedly referred to his need to reveal client confidences and strategies to the *bar association* when defending himself against the bar complaint, counsel and the trial court were scrupulous to avoid the disclosure of confidential information *to the court or the State*.

Nor does the record show a reversible failure to inquire. The trial court heard King's second attorney's basis for withdrawal at a hearing and concluded, as we do above, that there was no actual conflict of interest. Counsel at that hearing did not articulate a conflict other than a potential lack of enthusiasm for representing King after the bar complaint and a concern about his need to disclose confidential information to the bar association. Counsel failed to explain how the disclosure of confidential information to the bar would undermine counsel's ability to represent King in court. Further, the trial court was appropriately cautious and declined to risk becoming aware of confidential information before sentencing. *See id.* at 15 (trial court stated that if it learned about King's allegations, found them frivolous, and developed "some level of personal animosity because of that belief, that would not be fair to [King] for purposes of sentencing").

Moreover, the record does not show adverse performance or prejudice. After the State's attorney described at sentencing his own interactions with victims in the case, King's second attorney asked the trial court to "strike and disregard" those details, pointing out that they were "not based on the testimony presented at trial and [were] therefore not real facts." VRP (July 16, 2021) at 2059. He argued that although King was convicted of conspiracy, the court "should take into account individual behavior and individual responsibility," noting testimony about the fact that King did not participate in some of the more violent actions other gang members took. *Id.* at 2060. He pointed out that codefendants accused of more violent behavior took plea deals and maintained that, "subject to the limitations of the standard ranges in each charge," the court should not sentence King more severely than those codefendants simply because he exercised his right to a jury trial. *Id.* at 2061. Finally, he argued that "the gang aggravator should not be used to significantly increase the level of the offense because . . . the charge of . . . conspiracy covers the same conduct." *Id.* at 2062.

The record does not support reversal either because the trial court did not further inquire about a potential conflict or because King's second counsel was not allowed to withdraw. And to the extent King seeks to rely on evidence outside this record, a personal restraint petition is the appropriate vehicle for such a claim.

No. 55986-2-II

CONCLUSION

We affirm King's convictions and his sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_Glasgow, CJ_____
Glasgow, C.J.

We concur:

_Maxa, J._____
Maxa, J.

_Che, J._____
Che, J.